UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JAVIER OCHOA and JAIME CHAVEZ

**08 CR 511**

MAGISTRATE JUDGE KEYS

CRIMINAL COMPLAINT

CASE NUMBER:

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about June 25, 2008 in Cook county, in the Northern District of Illinois defendant(s),

knowingly and intentionally attempted to possess with the intent to distribute a controlled substance, namely in excess of 5 kilograms of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title 21 United States Code, Section(s) 846 and 2.

I further state that I am a(n) Task Force Officer, Drug Enforcement Administration and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof: _X_ Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

June 25, 2008 at Chicago, Illinois
Date                        City and State

ARLANDER KEYS, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

**FILED**

JUN 2 5 2008  TC

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| **STATE OF ILLINOIS** ) | |
| ) | SS |
| **COUNTY OF COOK** ) | |

## AFFIDAVIT

I, Michael Bedalow, being duly sworn on oath, state as follows:

1.  I am a Task Force Officer with the Drug Enforcement Administration ("DEA"), United States Department of Justice, and have been so employed for approximately one year. Since that time, I have been assigned to the DEA Chicago Field Division. In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, 846, and 848. I have been involved in various types of investigations, in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and investigations involving the laundering and concealing of proceeds of drug trafficking. I received specialized training in the enforcement of laws concerning the activities of narcotics traffickers. For the two years immediately prior to becoming a Task Force Officer with the DEA, I was a detective with the Justice Police Department. For the four years before that, I was a patrol officer with the Justice Police Department.

2.  The information set forth in this Affidavit is based upon my participation in this investigation, interviews of witnesses, information obtained from other law enforcement officers, and my experience and training. The recitation of facts contained in this Affidavit is not meant to be a complete narrative of all that has occurred in connection with this investigation, but is only a summary of facts necessary to show probable cause that Jaime CHAVEZ and Javier OCHOA attempted to possess with intent to distribute a controlled substance, namely, in excess of 5 kilograms of mixtures containing cocaine, Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846 and 2.

## Investigation

3. On or about June 18 or June 19, 2008, a paid confidential source ("CS") who was in Houston, Texas at the time and was working with the DEA, spoke to Individual A. According to the CS, Individual A informed the CS that he knew people who were interested in purchasing narcotics. Individual A then put Individual B on the phone. The CS understood Individual B to be the person interested in purchasing the narcotics. During that phone call, the CS told Individual B that he/she would was bringing a load of 100 kilograms of cocaine to Chicago. Individual B asked the CS to set aside 30 kilograms of the cocaine for him. Individual B and the CS then arranged to meet in Chicago on Monday, June 23, 2008.

4. On or about June 23, 2008, the CS and Individual A contacted Individual B to arrange the details for their meeting. Individual B instructed the CS and Individual A to go to 2177 Walcott, Apartment 103, Aurora, Illinois. DEA Agents later learned that CHAVEZ resides at that address.

5. At approximately 4:30 p.m. on the same day, the CS and Individual A arrived at the Walcott address. When the CS and Individual A arrived there, they were greeted by individuals later identified as OCHOA and CHAVEZ. Individual B was not present at the apartment. While at the apartment, OCHOA told the CS that he would like to purchase 30 kilograms of cocaine. OCHOA explained that he collects money from his customers in order to purchase narcotics. OCHOA reported that at the present time, he had enough money to purchase 10 kilograms of cocaine if the price is set at $19,750 per kilogram. The CS said that price was okay with him, so long as OCHOA agreed to purchase 30 kilograms. OCHOA also stated that he would attempt to collect more money from his customers while he was waiting for the drug shipment. OCHOA and the CS agreed that they should speak in code while discussing the drug transaction. Specifically, OCHOA and the CS agreed that "one hour" meant ten kilograms of cocaine; "two hours" meant twenty kilograms of

cocaine; and so on. The CS and OCHOA agreed to meet at Archer and Harlem in Summit, Illinois when the CS's drug shipment arrived. The CS said that when he/she called and asked OCHOA to meet him/her for "lunch" or "dinner," that meant that the shipment was ready and that they should meet. The CS also told OCHOA that when they met, the CS needed to first see OCHOA's money and then OCHOA should follow the CS to his/her warehouse where he/she was keeping the cocaine. The CS and OCHOA then exchanged phone numbers and the CS said he/she would call OCHOA when the cocaine shipment arrived. CHAVEZ was present at this meeting. The meeting between the CS, Individual A, OCHOA, and CHAVEZ was recorded.

6. That same night, the CS was in phone contact with OCHOA and said that the individual who was driving his narcotics shipment to Chicago, made a stop in Missouri, was waiting to be paid, and then would be leaving the next day. The conversation was recorded. In the morning of June 24, 2008, the CS was in phone contact with OCHOA and said that his/her driver left Missouri, was driving to Chicago, and should be in Chicago that night. The conversation was recorded. Later that same night, the CS was in phone contact with OCHOA and the CS said that the driver arrived and they should plan on meeting for "lunch" the next day. The CS also said he/she would call OCHOA the next morning to let him know everything was still on. The conversation was recorded.

7. In the morning of June 25, 2008, the CS called OCHOA. During that conversation, OCHOA said he would meet the CS in 45 minutes to an hour and that the other individual he was bringing to the deal was driving directly in front of him/her and would be there as well. OCHOA stated that the second individual was the same person the CS met at the June 23, 2008 meeting. The conversation was recorded. DEA Agents were conducting surveillance of OCHOA during the conversation. OCHOA was driving a blue Ford Focus. According to database queries, the Ford

Focus was registered to CHAVEZ. The car directly in front of the Ford Focus was a tan Mazda which is registered to OCHOA. A DEA Agent who was familiar with what CHAVEZ looks like confirmed that the driver of the tan Mazda was in fact CHAVEZ.

8. The CS again called OCHOA and told him to go to the Krispy Kreme parking lot. The blue Ford Focus pulled into the parking lot and parked next to the CS's car. The CS was then able to determine that the driver of the Ford Focus was OCHOA. Immediately thereafter, CHAVEZ, in the tan Mazda, pulled into the parking lot and parked across from the CS and OCHOA. At that time, OCHOA exited his vehicle and got into the CS's car. While in the car, the CS told OCHOA that he/she needed to see the money before he/she would give OCHOA narcotics. In response, OCHOA pulled out a stack of United States Currency ("USC") and explained that this was the money OCHOA would make as profit from the drug transaction. The CS then told OCHOA that he/she needed to see all of the purchase money before he/she would take OCHOA to the warehouse or show him the narcotics. OCHOA and the CS then exited the CS' vehicle and walked to the tan Mazda. OCHOA then opened the passenger door, reached to the rear of the car, and tore the rear inside side panel off of the car. While OCHOA was attempting to pry the panel off of the car, CHAVEZ complained that he did not want to conduct the deal in the open and that they should go to the warehouse. OCHOA was able to tear off the panel and showed the CS USC stacked in bundles that was stored in the rear side panel. OCHOA stated that the bundles of USC were $10,000 each. The CS reported seeing what appeared to be all of the purchase money for 10 kilograms of cocaine at the agreed upon price of $19,750 per kilogram.

9. Upon viewing the USC, the CS stated that he, OCHOA, and CHAVEZ should go back to his vehicle. CHAVEZ got out of his vehicle (the Mazda) at that time. Rather than getting back into the CS's vehicle, OCHOA got into the blue Ford Focus. The CS reported that he/she

looked over and saw OCHOA reaching behind the seat of the blue Ford Focus. The CS then waved CHAVEZ into his/her car. When CHAVEZ started to walk to the CS's vehicle, OCHOA told CHAVEZ to stay there and threw him a set of keys. OCHOA then walked toward the CS's vehicle. At that point, the CS contacted DEA Agents and reported that he/she had seen the drug money. DEA Agents then arrested both CHAVEZ and OCHOA. The meeting in the Krispy Kreme parking lot was both video and audio recorded.

10.    DEA Agents searched both cars incident to arrest. During the search of the blue Ford Focus, DEA Agents recovered a fully loaded 9 millimeter, semi-automatic pistol and a separate fully loaded magazine. DEA Agents recovered a slip of paper with, among other things, handwritten directions to the Burger King parking lot and "19,750." DEA Agents also recovered approximately $150,000 to $200,000.

## Conclusion

Based on the foregoing, Affiant respectfully submits that there is probable cause to believe that Javier Ochoa and Jamie Chavez attempted to possess with intent to distribute a controlled substance, namely, in excess of 5 kilograms of cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846 and 2.

FURTHER AFFIANT SAYETH NOT.

_____
Michael Bedalow
Task Force Officer
U.S. Drug Enforcement Administration

Subscribed and sworn to before me,
This 25th day of June, 2008

_____
UNITED STATES MAGISTRATE JUDGE